## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| **ELIZABETH ASHLEY AYUB- GENTRY,** | § | |
| **as next friend for T.A., a minor** | § | |
| **PLAINTIFFS,** | § | |
| | § | |
| **v.** | § | **C.A. NO. 6:23-cv-00165** |
| | § | |
| **ALL SAINTS EPISCOPAL SCHOOL,** | § | |
| **DEFENDANT.** | § | |

### PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW ELIZABETH ASHLEY AYUB- GENTRY as next friend on behalf of her son, T.A., a minor, ("Plaintiffs" herein) and files their *Original Complaint* alleging that the ALL SAINTS EPISCOPAL SCHOOL (hereinafter referred to as "ALL SAINTS") located in Tyler, Texas, violated the rights of T.A. in the manners and particulars more specifically addressed below. Plaintiffs reserve the right to replead if new claims and issues arise upon further development of the facts, as permitted by law. In support thereof Plaintiff would respectfully show this tribunal the following:

### I. INTRODUCTION

1.      The All Saints Episcopal School is located in Tyler, Texas. Upon information and belief All Saints received federal funds pursuant to *Paycheck Protection Program* ("PPP") of over a million dollars in 2020.  Receipt of such funds created a contract between the federal government and the receiver of such funds, requiring All Saints to adhere to various federal civil rights mandates, including and especially not to discriminate based upon disability and provide reasonable accommodations to students who have a disabling condition.   This is a

case about how All Saints and their Staff failed to keep its agreement with the federal government, and by extension with one of its students with a disability, T.A.  As more fully described below the acts, omissions of All Saints and their failure to accommodate T.A.'s disabilities had a significant effect upon the health and long term well-being of T.A.. Accordingly his mother brings forth this action pursuant to *Title III of the Americans with Disabilities Act*, 42 U.S.C. §12101 *et seq* ("the ADA"), *Section 504 of the Rehabilitation Act of 1973* and various state and common law claims.

## II. <u>JURISDICTION</u>

2. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C.A. §1331 and §1343 because the matters in controversy arise under the Constitution and laws of the United States.

3. Additionally, this Court has jurisdiction over her state and common law claims pursuant to 28 U.S.C.A. §1367.

## III. <u>VENUE</u>

4. Pursuant to 28 U.S.C. §1391 this Court is the proper Venue over this cause, as all events and omissions giving rise to Plaintiff claims occurred in the Easter District of Texas, Tyler Division.

## IV. <u>PARTIES</u>

5. As noted above, T.A. is a minor and lives with his mother Elizabeth Ashley Ayub-Gentry and step- father Ryan Gentry in Smith County, Texas.  During all times relevant to this cause he attended the All Saints Episcopal School in Tyler, Texas.

6. The Defendant All Saints Episcopal School is a Texas limited liability company doing business in the State of Texas and County of Smith. At all relevant times, All Saints had control over, was involved in, and directed the activity of their employees as alleged herein. The Defendant is

sued in all of their assumed, common or business names and notice is hereby given so that real parties in interest may appear and defend its actions.  The Defendant may served with process through the President of the Board of Trustees, the Honorable Laura Waits, at 2695 S. SW Loop 323, Tyler, Texas 75701; (903) 579-6000 [Telephone]; www.all-saints.org.

## V. FACTS

A.  ABOUT THE DEFENDANT

7.  All Saints Episcopal School is a PK-12 school that has non-profit organization and is located in Tyler, Texas.

8.  During the onset of the COVID19 Pandemic in 2020 the federal government initiated a Small Business Association ("SBA") loan program to supports small businesses' recovery from the economic impacts of the virus by providing accessible and borrower-friendly capital.

9.  As such, each entity that received such a loan was required to must follow certain federal statutory and regulatory requirements, as a requirement of receipt of such funds. including and especially to follow the anti-discrimination mandate of both Section 504 of the Rehabilitation Act of 1973 and the Americans With Disabilities Act.

10.  All Saints received monies from the federal government for "COVID-19 EIDL" funds in and around the amount of $1,217,700.00 on April 15, 2020.

B.  ABOUT T.A

11.  T.A. was born on September 27, 2012.  He has been asthmatic since his birth.  He also has allergies to much of the trees in East Texas, especially when pollinating in the Fall.

12.  He also has been diagnosed with Autism Spectrum Disorder.  He has some conversational skills but struggles with speech.  He does have functional play skills and motor skills. He has strong interest in drawing, reading, and writing comics and basketball.  He enjoys

discussions about topics of interest.

13.    Due to his disabilities T.A. does have some some issues as he struggles with emotional understanding of others and the environment. When he gets upset he can get loud.  He often needs something to deal with his stress like a putty ball. In the past T.A.'s mother has assured he received behavioral training at public school or in the community, to deal with some of his maladaptive social behaviors.

14.    At one time he attended the Cumberland Independent School District.  While there he received Special Education Services pursuant to the *Individualized With Disabilities Education Act* ("IDEA") for his disabling conditions.

C.    THE FALL 2022 SEMESTER

15.     On or about August 4th, mother called for a meeting to discuss T.A.'s disabilities, strength and weaknesses and physical problems. Mother shared with staff T.A. history with allergies, and breathing, use of nasal spray and inhaler when symptoms are pronounced.  Two of T.A.'s private therapists were present to discuss his educational needs.  Of import was that to help deal with stress and anxiety T.A. was given an item he could play with and break apart, like clay putty.

16.    Mother's impression was that staff seemed happy to have T.A. attend. The meeting went very well. Staff vowed to provide him any resources he needed.

17.    There was an open house on the 16th where mother provided information to Nursing Staff of T.A.'s health related issues.  Mother provided and filled out necessary medical information on line.

18.    By the start of school the counselor Amy Alsip and teachers, Natalie Lemmons, Ms. Nobles, Ms. Martin and the Headmistress Kathy Wood, knew of disabilities both physical, cognitive and behavioral.

19.     August 18th was the first day of school.  T.A. doesn't remember the exact date but he told his mother that Mrs. Martin, one of his teaches made him run three (3 ) laps after leaving science class.  It is unknown how many more times Martin or someone else made T.A. run but by the 26th he got very sick at school, vomited in Art Class and had to be picked up by his mother.  When mother picked him up from school T.A. had a fever and was severely dehydrated.

20.     T.A. was taken to Hospitality Hospital Emergency Room.  He was given an IV drip, breathing treatments, steroids and nausea medication. Upon release he was prescribed to take the inhaler every four hours until better.

21.     Mother reported to staff both the incident and treatments prescribed.  In fact, she went to the Nurse's Offices and spoke directly with Angela Bryant and Ruth Bush about T.A.'s needs.  She left an inhaler that would last, with the treatments prescribed 90 days.   There was also email communications about T.A.'s asthma and need for an inhaler every four hours.

22.     All Saints Administration and the Nurses Office had all the written information needed and set a schedule for a nurse to administer the inhaler at 9:00am and 1:00pm daily.

23.     A few days later on or about September 1st there was a meeting.  In attendance  Amy Alspil, Kathy Wood and ABA Specialist Kayla Aldredge, along with T.A.' mother and her husband.  Mother's impression was at that, it was clear that staff were no longer happy T.A. was at the Episcopal School and were finding it bothersome to provide T.A. his inhaler. Apparently when doing so, there was a slight uptick in his energies and behaviors.

24.     There was another meeting on September 29th with Counselor Alsip, Headmistress Woods with all three teachers present.  At that session there was much more discussion about the use of the inhaler.  In fact, Alsip asked how much longer would it be needed and discussed having more meeting on the topic.  Mrs. Gentry told Alsip she was discriminating against

T.A. by failing to consider his disabilities conditions, including the Asthma and behavioral concerns. Alsip reacted.  The meeting ended abruptly.

25.    A few weeks later T.A. was anxious in class and broke a pencil.  Mother later learned Martin had taken away the stress putty.

26.    For apparently disrupting class, Ms. Martin told T.A. if he could break a pencil he could run five laps again.  Moreover, Martin appointed another student with a megaphone whose job was to  intimidate T.A. to run all the laps.

27.    When mother picked T.A. from school the first thing when he got in the car was she could hear his loud audible wheezing. When she turned to look at him mother noticed he was pale and his throat was inverted deeply which told her he was desperately struggling to breathe.

28.    She asked if he'd done anything different today than other days and that's when he told her about the running incident.

29.    No one had called mother to let her know of T.A.'s condition.

30.    When mother asked, T.A. told her that the nurses had stopped giving him the inhaler treatments, and in fact, hadn't received any in about two weeks.

31.    Mother rushed home for a brief breathing treatment and then on to the hospital for necessary care.  At the hospital mother recollects that the nurses were quite alarmed when told what had happened. They brought T.A. steroids right away. They ran other tests to make sure he was not injured further.  They ordered a number of medications to get him back to functioning but even then he still wasn't doing well without being put on the nebulosere, a stronger medication. There were comments like "I would have lost my mind on that school, I hope you're not sending him back, this could have been very dangerous for him" and so on.

32.     Later that night Martin sent an email home but failed to mention the punishment.

33.     The family contacted the police and a police report was filed on the 21st of October.

34.     T.A. was put on a very specialized home-breathing machine.  He was receiving treatment every two hours.

35.     Even so he had a horrible coughing spells when he left the house and on the 23rd he had to return to the hospital. He received a new round of very strong steroids, and other medications for bronchial spasms.

36.     Officer Ryan Caldwell with the Special Investigations of the Tyler Police Department Forbey visited All Saints, where Martin admitted  making T.A. run.  When asked about whether or not T.A. was provided the Albuterol, both Alsip, Martin and a School Nurse refused to speak about it, or share any documents without a subpoena.  He did seek a subpeona.

37.     On or about November 1st the Officer visited T.A.'s home and shared with Ms. Ayub, his then findings.  While there he observed T.A. was still on a breathing machine.

38.     In and around the same time the nurses contacted Ms. Ayub inquiring if T.A. was missing school because of asthma.

39.     When T.A. saw his physician on November 18th, the doctor told mother that the recent incident where T.A. ran five laps and had a significant asthmatic attack as due to the fact there was a lack of preventative care.

40.     Nevertheless, he continued to experience vomiting, fevers and body tremors.  On December 15th he returned to the Hospitality Hospital ER and had his medical regimen modified.

41.     T.A. now has a strong distrust of teachers.  He fears going back to school. He visits a psychologist to deal with his fears, anxieties, communication issues and deteriorating social

skills.   He has significantly regressed in his daily functioning.

42.    Investigator Caldwell Officer informed  mother the Police Department would not be filing any criminal charges and her concerns were best addressed as a civil matter.

## VI. STATE ACTION

43.    Plaintiff incorporates by reference all the above-related paragraphs with the same force and effect as if herein set forth. In addition, each sentence and paragraph below, likewise incorporates by reference as if fully set forth herein, the ones above it.

44.    At all relevant and material times the Defendant Episcopal School was a recipient of federal funds, and was a public facility as contemplated federal and state law.

## VII. VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT

45.    The Americans with Disabilities Act ("ADA"),  provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."   The regulations implementing the Americans with Disabilities Act provide that it is discriminatory to deny a person with a disability the right to participate in or benefit from the aid, benefit, or service provided by a public entity.

46.    Because the services provided to T.A. were not as effective as those provided his non-disabled peers, the Defendant has subjected him to discrimination on the basis of disability.

47.    Due to such acts, omissions, refusals, and denials of services she has been significantly injured thereby.

48.    Accordingly, Plaintiff is entitled to a full array of relevant compensatory relief pursuant to Title III of the ADA, including an award of attorney's fees, costs and other reasonable disbursements as contemplated 42 U.S.C. §2000-3(a). Plaintiff also seeks injunctive relief

as contemplated by 42 U.S.C. §12188(a)(1)-(2).

## VIII. VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT OF 1973

49.     The Section 504 of the Rehabilitation Act of 1973 provides that no otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

50.     Because the communication services provided to T.A. were not as effective as those provided his non-disabled peers, the Defendant subjected him to discrimination on the basis of his disability. Due to such acts, omissions, refusals and denials of services by All Saints he has been significantly injured thereby.

51.     Plaintiff is entitled to a full array of damages as more fully described below, including but not limited to compensatory relief and an award of attorney's fees, costs and other reasonable damages and disbursements as contemplated Section 505 of the Rehabilitation Act of 1973, 29 U.S.C. §794a. Such damages include but are not limited to compensatory damages otherwise contemplated by a breach of contract.

## X.  CLAIMS PURSUANT TO THE TEXAS HUMAN RESOURCES CODE

52.     Chapter 121 of the Texas Human Resources Code creates duties for public entities like All Saints to fulfill, when serving the needs of a person with disabilities, like T.A. in this cause. Those duties generally include the "duty to make reasonable accommodations in policies, practices and procedures." Texas Human Resources Code §121.003(d)(2). As All Saints failed to provide T.A., a person with a disability covered by this Chapter necessary "reasonable accommodations" it creates a private cause of action for him, pursuant to Texas

Human Resources Code §121.004(b) where he, an aggrieved party, may seek a full array of damages including mental anguish damages.

## XI.  CLAIMS PURSUANT TO THE COMMON LAW

53.  Plaintiff alleges that the All Saints Episcopal School Staff had a duty to provide T.A. a safe and non-hostile educational environment commensurate with his unique and individualized needs, did not and were negligent thereby.

54.  Moreover, the All Saints Board of Directors failed to correctly supervise staff.

55.  Further,  the All Saints Board of Directors failed to correctly train staff.

56.  Last, the Teachers and especially the Nursing Staff had a professional standard of care to adhere to when addressing T.A.'s asthma and did not.  This failure was not merely negligent but rose to the level of gross negligence.

57.  T.A. suffered damages because of such negligence and gross negligence.

## XII. RATIFICATION AND RESPONDEAT SUPERIOR

58.  All Saints ratified the acts, omissions and customs of School personnel and staff.

59.  Additionally, All Saints  is responsible for the acts and omissions of staff persons who were otherwise responsible for the T.A.'s care and safety as contemplated by the theory of *Respondeat Superior.*

## XIII. DAMAGES

54.  As a direct and proximate result of the Defendant's conduct, T.A. and his family have suffered the following injuries and damages, which they are entitled to recover herein within the jurisdictional limits of this court:

    a.      Normal, incidental and nominal damages;

    b.      Restitution including costs of cure;

c.      Past financial losses;

d.      Future financial losses;

e.      Disfigurement;

f.      Loss of consortium;

g.      Loss of enjoyment;

h.      Loss of opportunity;

i.      Past pain and discomfort;

j.      Reimbursement for past medical expenses;

k.      Reimbursement for future medical expenses;

l.      Reimbursement for past mental health expenses;

m.      Reimbursement for future mental health expenses;

n.      Reimbursement for past mental anguish;

o.      Reimbursement for future mental anguish;

p.      Reimbursement for past educational costs;

q.      Reimbursement for future educational costs;

r.      Various out-of-pocket expenses incurred by the family but for the acts and omissions
of the Defendant; and

s.      Any such other relief that a Jury can give in law or in equity or both.

## XIV. <u>DEMAND FOR A JURY TRIAL</u>

55.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demand a jury trial for all issues
in this matter.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays in the manner and particulars noted

above, for the Court to enter a judgment in an amount sufficient to fully compensate her for the

elements of damages enumerated above, judgment for damages, recovery of attorney's fees and

costs for the preparation and trial of this cause of action, equitable relief requested and for its appeal

if required, pursuant to the Title II and Title III of the ADA and Section 504, the common law and

the Texas Human Resources Code together with pre- and post-judgment interest, and court costs

expended herein, and for such other relief as this Court, deems just whether at law or in equity, or

as to both.

Respectfully submitted,

*/s/ Martin J. Cirkiel*
Mr. Martin J. Cirkiel, Esq.
Texas Bar No. 00783829
marty@cirkielaw.com [Email]
Cirkiel Law Group,  P.C.
1901 E. Palm Valley Blvd.
Round Rock, Texas 78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]

Mr. Anthony O'Hanlon, Esq.
Texas Bar No. 15235520
anthony.ohanlon@somlaw.net [Email]
Anthony O'Hanlon, P.C.
111 South Travis Street
Sherman, Texas 75090
(903) 892-9133 [Telephone]
(903) 957-4302 [Facsimile]